UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GILDARDO ERAZO and
ROSALBA ERAZO MONTANA,

               Plaintiffs,           **MEMORANDUM AND ORDER**
                                        16-CV-2386 (RRM) (RER)

      -against-

SCM GROUP NORTH AMERICA and
WURTH BAER SUPPLY COMPANY,

               Defendants.
-------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

On February 6, 2013, plaintiff Gildardo Erazo – a New York carpenter with decades of experience operating table saws – was injured when his left hand contacted the still-spinning circular blade of an SCM model Si350n Sliding Table Saw (the "Saw"), marketed by defendant SCM Group North America, Inc. ("SCM" or "Defendant"), a Georgia corporation. On January 25, 2016, Erazo and his wife, Rosalba Erazo Montana ("Montana"), commenced an action against SCM and an Illinois corporation, Wurth Baer Supply Company, in the Supreme Court of the State of New York, Queens County, alleging negligence, strict product liability, breach of implied warranties and loss of consortium. That action was subsequently removed to this Court on diversity grounds.

After completing fact discovery and deposing plaintiffs' expert, Darry Robert Holt, about his eight-page report dated May 11, 2017, SCM served plaintiffs with two motions: 1) a motion for summary judgment and 2) a motion to exclude the report and testimony of plaintiffs' expert. As part of their opposition to the motions, plaintiffs filed an 18-page affidavit from Holt which expresses opinions and references scholarly works that were not discussed or listed in his report.

Accordingly, along with its replies, SCM filed a third motion, seeking to strike Holt's affidavit in its entirety. For the reasons set forth below, SCM's motions to exclude Holt's report and testimony and the motion to strike Holt's affidavit are granted in part and denied in part, SCM's motion for summary judgment is granted in its entirety, and this action is dismissed.

## I.  Background

### A.  The Saw

Unless otherwise indicated, the facts contained in this Section I are not in dispute. The Saw is a large industrial woodworking machine used in the production of cabinets and other furniture. (Defendant's Statement of Undisputed Material Facts ("Def. 56.1 Stat."), ¶ 1; Response by Plaintiffs to the Statement of Undisputed Material Facts ("Pl. 56.1 Stat."), ¶ 1). Plaintiffs' expert succinctly describes the Saw as:

> a woodworking tool comprised of a motor-driven circular saw blade, adjustable in height, projecting through a slot in a sliding table upon which boards are rested and manipulated as cuts as made. The saw is equipped with a rip fence aligned parallel to the blade to adjust the width of a rip cut and guide the workpiece. The saw is equipped with an over-arm hood guard which can be rotated into position over the blade and adjusted vertically to accept the workpiece. The saw is also equipped with a riving knife which can be attached beyond the blade rear and which moves in concert with the blade arbor.

Expert Report of Darry Robert Holt dated May 11, 2017 ("Holt's Report") (Doc. No. 35-8), p. 3.

Photographs of the Saw are contained both in the Saw's "Operation and Maintenance" manual ("Manual") (attached to Pl. 56.1 Stat. as Ex. 4) (Doc. No. 39-4), and the Affidavit of Jonathan Bagby, a service team leader for SCM (Doc. No. 35-4). In addition, the Manual contains diagrams of the Saw and a description of its features. Since a basic understanding of the machine is essential to understanding the issues herein, the Court will describe it in more detail.

First, the sliding metal table is long and thin and can be manually pushed along a track which sits atop a long, thin cabinet.  There are two handwheels built into the center of the long side of the cabinet facing the operator; the one on the left raises and lowers the blade, while the one on the right controls the pitch or tilt of the blade.  To the right of the handwheels is a "control board," which has buttons to start and stop the Saw's motor, as well as an "emergency button" for use "[i]n case of danger."  Manual, p. 3.2.  According to the Manual, "if you press the emergency button, any function of the machine is locked."  *Id.*

The circular saw blade (the "Blade") is parallel to the sliding table and sits directly across the sliding table from the handwheel that raises and lowers the Blade.  Beyond the Blade is the "rip fence" – a long barrier that is a few inches high and can be moved towards or away from the Blade, which is parallel to it.[1]  At the rear of the Saw is a stanchion which supports an "over-arm" – a swinging horizontal arm which extends towards the front of the Saw and supports the "hood guard," which is connected to it.

The hood guard (the "Guard") is a shark-fin shaped, transparent sleeve that fits over the Blade.  The top of the Guard connects to the over-arm; the bottom features some wooden trim around the slot which accommodates the blade.  There is a red handle at the front of the Guard which enables the operator to position it above the workpiece.  According to Holt, it is "adjustable … to any height … within reason," so that it can be lowered just above the thickness of the material being cut.  (Deposition of Darry Robert Holt ("Holt Dep.") p. 59).  When lowered in this manner, it creates a barrier on all sides that prevents the operator's hands from contacting the Blade, so long as the workpiece – the material being cut – is there.  (*Id.*, pp. 59-60).

---

[1] The Manual refers to the rip fence as a "fence for parallel cuts."  (Manual, p. 1.5).

The Saw also features a riving knife – a thin, curved piece of metal mounted just behind the Blade. The curve on the edge of the riving knife closest to the Blade is roughly the same diameter as the Blade itself and, according to the Manual, the gap between the riving knife and the Blade should be 3–4 millimeters. (Manual, p. 4.6). As Holt's Report explains, the purpose of the riving knife is twofold. First, it creates a "barrier to personnel blade contact from the rear." (Holt's Report, p. 3). Second, it denies "access of the workpiece to the rear teeth of the blade to prevent kickbacks." (*Id.*).

A "kickback" occurs when the workpiece "is, for lack of a better word, kicked back" in the direction from which it was fed into the Blade. (Deposition of Jonathan Glenn Bagby ("Bagby Dep."), p. 62). According to Holt, kickbacks can be caused by the "kerf" – *i.e.*, the slit made by the saw – "closing in on the blade, or the lifting force of the blade teeth on the side or underside of the workpiece." (Affidavit of Darry Robert Holt ("Holt Aff."), ¶ 13). The riving knife keeps the kerf open and thus serves to "minimize the possibility of a kickback … resulting from the kerf closing on the back of the blade." (*Id.*, ¶ 5).

The Saw can accommodate Blades of diameters ranging from 250 to 350 millimeters. (Manual, p. 1.16). Accordingly, the Saw comes equipped with two riving knives: one for use with a 250-millimeter Blade and one for use with Blades having diameters of 300 to 315 millimeters. (Manual, p. 4.7). To remove a riving knife, one pulls back the sliding table, lifts two hooks or releases on a side guard covering the arbor holding the riving knife, uses a wrench to loosen a nut that holds the riving knife in place, and pulls the riving knife off a threaded bolt. (Deposition of Jack E. Hyde, Jr. ("Hyde Dep."), p. 88; *see* Deposition of Gildardo Erazo ("Erazo Dep."), pp. 103–04, and Manual, pp. 4.4–4.6). To install a new riving knife, one places the new knife on the bolt, tightens the nut, closes the side guard and pushes the sliding table back into

place.  (Hyde Dep., p. 88).  Defendant's expert, Jack E. Hyde, Jr., states that this entire process "should take less than a minute," (*id.*), while plaintiffs' expert, Holt, estimates that it took him "probably a couple minutes." (Holt Dep., p. 62).

### B.  Erazo's Experience Using Table Saws

At the time of his accident in February 2013, Mr. Erazo was 59 years old, had been a carpenter most of his life, and had operated at least five different table saws.  (*Id*., pp. 8, 225).  When he was born, his father owned a carpentry shop in Cali, Colombia, which had two table saws:  a large one which Erazo's father had constructed himself and a smaller one, the manufacturer of which Erazo could no longer recall.  (*Id*., pp. 16–17; Erazo Aff., ¶ 3).  Erazo spent time in the shop as a boy, so he learned at a very early age that he could be seriously injured if his hand contacted an operating saw blade.  (Erazo Dep., pp. 16, 18).  However, neither of the table saws was equipped with a blade guard or riving knife, so he did not learn about these safety devices from his father.  (Erazo Dep., p. 19; Erazo Aff., ¶ 3).  Indeed, when instructing Erazo about safety, the father instructed Erazo only "[t]o be very careful with the saws."  (Erazo Dep., p. 18).

After graduating from high school in 1975 and studying for a year at the University Santiago di Cali, Erazo spent as many as ten years working in his father's shop.  (Erazo Dep., pp. 12, 23).  He became a machine operator in 1980 and spent three or four years operating the two table saws.  (Erazo Dep., pp. 16 17).  During his tenure in the shop, he saw kickbacks occur "many times" and experienced several himself: approximately five or six while using the large saw and two while using the smaller one.  (Erazo Dep., pp. 20, 40).  Erazo did not understand why or how a kickback occurred and his father never explained it.  (Erazo Aff., ¶ 5).  However,

his father told him what to do in the event of a kickback: "move the wood back off the blade and hold the trailing edge very tightly to control the wood." (*Id.*).

In 1986, Erazo – who already considered himself an experienced carpenter – emigrated to the United States. (Erazo Dep., pp. 9, 38). Later that year, he found a job at Petrucelli's carpentry shop on 37th Avenue in Flushing, Queens, assembling furniture. (*Id.*, pp. 34–35). Within two or three months, he became a machine operator there, cutting wood with a table saw. (*Id.*, p. 35). That table saw resembled the large one he had operated in Colombia: it had a wooden cabinet and table and no blade guard. (*Id.*, pp. 36-38).

Erazo worked with that table saw for eight hours a day for about seven or eight years. (*Id.*, 37–39). During that period, Erazo experienced 20 to 30 kickbacks but was uninjured. (*Id.*, pp. 40–41). Indeed, Erazo could recall being injured only once before the accident at issue; in 1988, a pencil he was using to push one-inch-thick plywood though the saw broke, resulting in a laceration to his right index finger. (*Id.*, pp. 41, 251).

After seven or eight years, that table saw was retired and Erazo was assigned to operate another one at Petrucelli's other location: 133-20 Whitestone Expressway, Flushing. (*Id.*, pp. 37, 48–49). Erazo operated that machine – which, like all the others Erazo had operated, lacked a blade guard – for eight hours a day for another seven or eight years. (*Id.*, pp. 38–39). Although that machine had a riving knife, Erazo used it only once, after his boss – Crispino Imperatore – told him to try it. (*Id.*, pp. 146–47). Erazo experienced kickbacks 15 to 20 times while working on this machine. (*Id.*, pp. 40–41).

Erazo stopped using that machine in 2001, when Petrucelli acquired the Saw. (*Id.*, p. 49; Def. Stat., ¶ 11; Pl. Stat. ¶ 11). The Saw was essentially new at the time it was installed in the Whitestone Expressway shop. It had been manufactured in Italy in 2000 by SCM Group S.p.A,

which then shipped it to SCM in Georgia.  (Def. Stat., ¶¶ 9-10; Pl. Stat. ¶¶ 9-10).  On April 18, 2001, SCM sold and delivered the Saw to Alltech Machinery, Inc., which then sold and delivered the Saw to Petrucelli.  (Def. 56.1 Stat., ¶ 11; Pl. 56.1 Stat. ¶ 11).

There is some dispute regarding whether Erazo was in the Whitestone Expressway shop on the day that the Saw was installed and what training he received.  At his deposition, Imperatore testified that Erazo was present when the Saw arrived and that the technicians not only installed both the Guard and riving knife but said that the Guard should always be used.  (Deposition of Crispino Imperatore ("Imperatore Dep."), p. 17).  However, Erazo claims that he was working at Petrucelli's 37th Avenue location when the Saw was delivered and that he never met the technicians who installed it.  (Erazo Dep., p. 50, Erazo Aff., ¶ 10).

It is undisputed, however, that Erazo never saw the Manual and, despite knowing that "[t]hey stored it away," never asked to see it.  (Erazo Dep., pp. 52, 79).  In addition, while there may have been a warning label on the Guard which read, "Do not remove this guard. Guard must be in place at all times when machine is in operation," Erazo could not read English well enough to read the label.  (*Id.*, pp. 77–78).  According to Erazo, the only training he received came from Imperatore.  (*Id.*, p. 52).

Regardless of the training Erazo received, there is no question that, at the time of the accident, Erazo knew the danger posed by an unguarded Blade and that the fact that the Guard and riving knife protected him from that danger.  First, Erazo himself admitted that he "fully understood the dangers of getting injured if [his] hand contacted the blade."  (*Id.*, p. 226).  Accordingly, at the time of the accident, he did not need "any additional warning[s] or instructions" regarding the risk of injury from the spinning Blade.  (*Id.*).

Second, Erazo himself recalled that Imperatore explained that the Guard came down over the Blade to reduce the risk of the operator's hand contacting it. (Erazo Dep., pp. 66, 68–69). Accordingly, he understood that the purpose of the Guard – which he called a "protector," (*id.*, p. 65) – was to cover the Blade and protect his hands. (*Id.*, p. 66). In addition, Erazo understood that the inspectors who visited the workshop at least once a year believed that the Guard should be used at all times. (*Id.*, p. 83). Indeed, whenever an inspector came, Erazo would position the Guard back over the Blade. (*Id.*, p. 73).

Erazo also knew that the riving knife was a "protector." (*Id.*, p. 146). Imperatore told him that its purpose was to protect him and that the riving knife would prevent him from being cut if he reached behind the blade. (*Id.*, pp. 106–07, 230). At his deposition, Erazo testified that "[w]hen [it] was in place, it was protecting [him] from being cut." (*Id.*, p. 107). However, Erazo claimed that he did not know that the riving knife also served to prevent kickbacks. (*Id.*, pp. 105, 146).

When Erazo first used the Saw, both the Guard and the riving knife were in place. (*Id.*, pp. 65–66, 104). However, Erazo used the riving knife only twice and used the Guard no more than three times. (*Id.*, pp. 73–74, 104, 154). Thereafter, he never used the Guard or the riving knife again during the ten years he served as the "primary operator" of the Saw. (*Id.*, pp. 53–54, 66). During that period, he used the Saw eight hours a day, making approximately 200 cuts per day. (*Id.*, p. 67). He experienced 20 to 30 kickbacks while operating the Saw but was never injured. (*Id.*, pp. 54–55).

In his deposition testimony and affidavit, Erazo provided two reasons for not using the safety devices. First, he did not like using them. He testified that the Guard was "very uncomfortable to work with" because it was "very heavy" and made the workpiece "harder to

push." (*Id.*, pp. 74–75). Having spent decades using unguarded table saws without a major accident, he felt "uncomfortable," and not safer, using the Guard. (*Id.*, p. 154). In addition, both the wood trim along the bottom of the Guard and the red handle used to adjust it blocked his view of the workpiece, making it harder to see if the Blade was "out of alignment" or if the cut was "perfectly straight." (Erazo Aff., ¶ 14).

The riving knife "bothered [Erazo] a lot" because he had to "make many different cuts." (Erazo Dep., p. 148). The riving knife could not be used for certain cuts, such as "plunge cuts" in which the wood was laid flat on the table and the circular saw was raised through the wood. (*Id.*, pp. 104–05). Erazo knew how to install the riving knife, but the process involved the use of a wrench. (*Id.*, p. 103). Although Erazo's testimony implied that the process took some time, Erazo did not testify precisely how long it took him to install the riving knife.

The delays inherent in using the safety devices were also central to the second reason Erazo gave for not using them: namely, that his boss told him not to. According to Erazo, Imperatore told him to remove the riving knife because it could not used for certain types of cuts. (*Id.*, pp. 104–05). In addition, although the Guard took only a "little bit longer" to use, Imperatore allegedly told him to "remove" it "because it was not giving off production." (*Id.*, pp. 66, 72). According to Erazo, Imperatore told him to "take it off and just run it back to the left." (*Id.*, pp. 66, 74).

While there is a factual dispute as to why Erazo chose not to use the Guard and the riving knife, the dispute pertains only to the second reason. At his deposition, Imperatore testified that Erazo did not like to use the riving knife solely because he believed that it was easier to cut wood without it. (*Id.*, p. 21). Imperatore denied telling Erazo to remove the Guard. (Imperatore Dep., p. 24). Indeed, Imperatore claimed that it was Petrucelli's policy to require use of the Guard and

that, when the Saw arrived, someone put up a sign which read: "Blade guard must be used at all times." (*Id.*, pp. 25, 34). When he observed Erazo not using the Guard, Imperatore would tell him, in Spanish, to "[p]ut the guard on." (*Id.*, pp. 24–25, 51). He also told Erazo in Spanish that had to use the Guard "all the time." (*Id.*, p. 50). According to Imperatore, Erazo would comply only temporarily and would take the Guard off again within a day or two. (*Id.*, p. 31).

Imperatore also testified that Petrucelli did not use the Saw to make cuts for which the riving knife and Guard could not be used. (*Id.*, p. 31). Imperatore, who operated the Saw himself whenever Erazo was absent, always used both the Guard and riving knife. (*Id.*, pp. 21, 23–24).

### C. The Accident

The accident at issue occurred around noon on February 6, 2013, about four hours after Erazo had begun work. (Erazo Dep., pp. 121–22). Erazo was attempting to fabricate a piece of plywood three-quarters of an inch thick, one-and-one-quarter inches wide, and 66 inches long. (Erazo Dep., pp. 122–123). To that end, he selected a 66-inch length of three-quarter-inch thick plywood which was already only two or three inches wide. (*Id.*, pp. 123, 178; Erazo Aff., ¶ 30). Having adjusted the rip fence to the desired width, he placed workpiece lengthwise on the sliding table and pushed the long side of the wood against the rip fence. (Erazo Dep., p. 178). At the time he began the cut, his right hand was about 66 inches from the Blade, his left hand was "[m]aybe 30 inches" away, and he was pushing the wood both against the fence and down on the sliding table. (*Id.*, p. 187).

Standing at the front of the Saw near the control panel, Erazo slid the table to his left about 20 inches before the wood "got stuck" with about three or four inches of the 66-inch length having passed the rear of the Blade. (*Id.*, pp. 119, 177, 200). He did not know what caused the

wood to become stuck, although he testified at his deposition that he "always had that problem … with the small pieces." (*Id.*, pp. 187, 196). Although the emergency button had been broken for about a year at the time of the accident, Erazo could have turned off the saw by hitting a toggle switch with his knee or foot. (*Id.*, pp. 189–90, 203). Indeed, when asked if he had used his "shoe to hit the toggle switch to turn the machine off … before while … cutting," Erazo responded, "Of course." (*Id.*, p. 190).

Erazo elected not to turn off the Saw. In addition, contrary to his father's advice, he did not move the wood back off the Blade. Rather, he reached his left hand across the sliding table, grabbed the leading edge of the wood, and lifted it. (*Id.*, pp. 119–21, 191). The wood kicked back. (*Id.*, 120, 162). As Erazo tried to control the wood, his left hand contacted the still-spinning Blade, which severed his pinky finger and injured his thumb and his ring and middle fingers. (*Id.*, pp. 230–31, 234).

### D. The Complaint

In January 2016, Erazo and his wife, Montana, commenced this action by electronically filing a verified complaint (hereafter, the "Complaint") in the Supreme Court of the State of New York, Queens County. The Complaint names two defendants: SCM and Wurth Baer Supply Corporation ("Wurth Baer"). According to the Complaint, Wurth Baer is an Illinois corporation "regularly engaged in the business of selling, designing, distributing, marketing, and maintaining SCM table saws for commercial uses and to be used by consumers," including Erazo. (Compl., ¶¶ 1, 7, 13).

The pleading contains few specific factual allegations. It alleges that Erazo sustained personal injuries on February 6, 2013, when the Saw – manufactured, designed, inspected and sold by SCM – "caught the wood plaintiff was attempting to saw and kicked back," drawing

Erazo's hand into the Blade. (*Id.*, ¶¶ 15, 19). The Complaint also alleges that Erazo was using the Saw in "a proper manner, consistent with the use for which the table saw was designed, manufactured, marketed, and sold by defendants" at the time of the accident. (*Id.*, ¶ 16). In addition, the pleading alleges that after the sale of the Saw by defendants but prior to the accident, SCM "commenced designing, manufacturing, inspecting and marketing … table saws with Saw Stop brakes as component parts of SCM table saws." (*Id.*, ¶ 17).

The Complaint alleges five causes of action. The first alleges that the defendants acted "carelessly, recklessly and negligently designing, manufacturing, servicing, repairing, inspecting, marketing, disturbing and selling" the Saw. (*Id.*, ¶ 20). This cause of action specifically identifies some of defendants' allegedly negligent acts or omissions, including the "failure to install a Saw Stop brake prior to the incident" and the "failure to implement and perform post-sale duties to warn and retrofit the [Saw] … to prevent the injuries complained of herein." (*Id.*, ¶ 20(c) & (e)).

The second cause of action alleges that the Saw was "defective" and that the "defects" were a substantial factor in causing the accident. (*Id.*, ¶¶ 27–28). Although the cause of action does not identify the defects, it implies that these were latent defects which Erazo "could not have discovered … by the use of reasonable care," (*id.*, ¶ 30), and which rendered the Saw "unsafe," (*id.*, ¶ 32). The cause of action also alleges that Erazo did not commit any "culpable conduct." (*Id.*, ¶ 36).

The third and fourth causes of action appear to allege breach of the implied warranties of merchantability and fitness for a particular purpose. The fifth cause of action is brought by Montana for loss of consortium. The Complaint seeks money damages "in an amount that exceeds the jurisdictional limitations of all lower courts of competent jurisdiction." (*Id.*, p. 12).

In May 2016, SCM removed the action to this Court on diversity grounds. (Doc. No. 1). On August 23, 2016, plaintiffs and Wurth Baer stipulated to dismiss all claims against Wurth Baer with prejudice and without costs to either party. Since then, this action has proceeded against SCM alone.

### E. Holt's Report and Deposition Testimony

During discovery, plaintiffs disclosed a report written by their expert, Holt. Holt's Report opines:

> The rotating blade hazard on the [Saw] … is inadequately safeguarded. The blade guard and riving knife are easily removable to perform cuts for which the saw was designed and provide no blade hazard control when removed. Further, the saw is not equipped with anti-kickback pawls as required by ANSI 01.1 standard for woodworking equipment.

(Holt's Report, p. 2). However, Holt's Report does not contain any explanation of what pawls are, how they function, or how they could have prevented the accident at issue. Indeed, Holt's Report implies that pawls are not used on all table saws, noting:

> Historically, table saws have been equipped with blade guards of different types. In the United States, table saws were equipped with a combination 3 in 1 guard comprised of a hood, splitter and anti-kickback pawls, or a suspended hood guard and separate riving knife such as that on the subject saw.

(*Id.*, p. 4).

Holt's Report contains a more detailed discussion of blade guards, but that discussion makes clear that removable blade guards are an essential feature of all table saws. According to Holt's Report, all blade guards have "to be removed for non-thru cutting operations," and, historically, have often been "removed by users for a variety of reasons which they found interfere with the efficient use of the table saw," including "visibility problems." (*Id.*). Indeed, Holt notes that "[i]t has long been known in the table saw industry that table saw guards are often

13

removed by saw operators because they interfere with the view of their work." (*Id.*). Holt's Report indicates that the industry has been grappling with this problem since at least 1924 but does not identify a design which has managed to resolve the problem altogether. (*Id.*). Holt states that "the Power Tool Institute (PTI) developed a modular guard to make the guard more user friendly and thus reduce the frequency of removal or non-use." (*Id.*). However, Holt does not provide any further information regarding PTI's "modular guard" or provide any evidence that this guard is more "user friendly" than the Saw's Guard.

According to Holt, riving knives must also be "removed for non-thru cutting operations." (*Id.*). Holt concedes that the fact that the riving knife on the Saw is "easily removable … improves the saw utility as its absence in the operable position allows cuts to be made which cannot be made otherwise, such as plunge cuts." (*Id.*, p. 7). However, the expert opines that the riving knife's removability, "although providing increased utility, makes the saw not reasonably safe for its intended and foreseeable use and defective in design because of the risk presented to users without the riving knife in place." (*Id.*).

Holt posits that "a technologically and economically feasible alternative to a removable riving knife is a non-removable riving knife which can be adjusted into a position which does not interfere" with plunge and non-through cuts. (*Id.*). Holt claims that the Saw could have been designed with a "non-removable riving knife with a stored position similar to the Bosch 4100." (*Id.*). Holt asserts that such a riving knife, which is retractable rather than removable, "would be more probably placed in the protective position after making a cut for which it could not be in such a position." (*Id.*). He concludes: "Had the design [of the Saw] included a stowed position for the riving knife, it would be more probable to be installed and in the protective position to prevent an accident such as Mr. Erazo's." (*Id.*).

At his deposition on August 24, 2017, Holt acknowledged that his report contained no opinions about warnings or instructions. (Holt Dep., p. 50). He also clarified that he was not asserting that the Saw was defective because it lacked a "Saw Stop brake" – a "flesh detection" system that stops the saw blade automatically upon contact with skin. (*Id.*, p. 16). In addition, Holt admitted that his report did not say that the absence of anti-kickback pawls caused or contributed to Erazo's accident. (*Id.*, p. 122).

Holt testified that the Saw, as designed, afforded Erazo three ways to avoid the accident. First, the Guard would have created a barrier on all four sides of the Blade if it had been properly lowered to just above the thickness of the workpiece. (*Id.*, p. 60). Holt testified that the Guard was attached to the Saw at the time of Holt's inspection and took only "a few seconds" to adjust to the proper position. (*Id.*, pp. 61-62). Holt opined that Erazo could have used the Guard in making the rip cut which led to his injury, and that he would not have been injured if he had done so. (*Id.*, pp. 93-94).

Second, the riving knife, even if used alone, would have created a "barrier to access to the rear teeth of the blade from the rear." (*Id.*, p. 61). The riving knife was not attached to the Saw when Holt arrived to inspect it but was in a toolbox adjacent to the Saw. (*Id.*, p. 62). Holt installed the riving knife himself during the inspection and testified that it took "probably a couple minutes" to install. (*Id.*). Holt opined that Erazo could have used the riving knife while making the rip cut which led to his injury, and that he would not have been injured if he had done so. (*Id.*, p. 94).

Third, Erazo always had the option of turning the Saw off once the workpiece became stuck. (*Id.*, p. 90). As Holt observed: "If there's no motion of the blade, you're not going to get

cut." (*Id.*, p. 91). However, Erazo elected to reach across the sliding table and to attempt to lift the leading edge of the board with the saw still spinning at 4,000 revolutions per minute. (*Id.*).

### F. Motions for Summary Judgment and to Exclude Holt's Report and Testimony

On August 24, 2018, SCM filed two fully briefed motions: a motion for summary judgment and a motion to exclude both Holt's Report and his testimony. The motion for summary judgment raises five arguments. First, SCM argues that plaintiffs' products liability claims fail for lack of evidence that the Saw was defectively designed or unreasonably dangerous. SCM characterizes Holt's Report as opining that the "Saw was defectively designed because its riving knife must be removed to enable the user to make certain types of cuts" but argues that Holt's opinions are "unreliable and irrelevant and should be excluded." (Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Defendant's MSJ Memo"), p. 15). Similarly, while SCM acknowledges that Holt proposes an alternative design involving an adjustable "riving knife that is permanently stored on the saw itself," SCM argues that Holt 1) "performed no testing and prepared no model, prototype or drawings to determine whether his concept … would work on the … Saw, which uses blades and riving knives of different sizes," and 2) "provided no studies or statistical evidence demonstrating the greater propensity of a person such as Erazo, who never uses riving knives at all because he does not like them, to actually use a riving knife that is stored on the saw itself rather than in a toolbox a few feet away." (*Id.*).

Second, defendant argues that the sole proximate cause of Erazo's injuries was his failure to use available safety devices and that his injuries were "not the result of a defective or negligently designed product." (*Id.*, p. 13). Third, with respect to plaintiffs' claim that SCM breached its "post-sale duties to warn and retrofit the … [S]aw so as to prevent the injuries" at

issue, SCM argues that 1) it had no such post-sale duties under New York law; 2) there was no duty to warn of open and obvious dangers, and 3) the warnings it provided were adequate. Fourth, SCM argues that the breach of implied warranty claims set forth in plaintiffs' third and fourth causes of action are barred by the four-year statute of limitations set forth in section 2-275 of the New York Uniform Commercial Code. Fifth and finally, SCM argues that the loss of consortium claim contained in plaintiffs' fifth cause of action is a derivative claim and must be dismissed if summary judgment is granted with respect to the other causes of action.

The motion to exclude Holt's Report and testimony (the "Exclusion Motion") focuses largely on those portions of Holt's Report which opines that the Saw is defective because the riving knife is removable, and which proposes a retractable riving knife as a safer alternative design. SCM argues that Holt's concept of a permanently attached, but retractable, riving knife originates with the Bosch 4100, a small table saw first introduced in 2007. SCM notes that Holt has offered no evidence that the concept was technologically or economically feasible in 2000, or that it could be adapted to the much larger Saw which, unlike the Bosch 4100, is designed to be used with circular saws of varying diameters. SCM also notes that Holt does not purport to be a human factors expert, and that his report provides no statistical evidence or studies to support his supposition that it is "more probable" that the stored riving knife would be used. SCM maintains that "the evidence is undisputed that Erazo would not have used a riving knife regardless of where it was located in relation to the … Saw." (Defendant's Memorandum of Law in Support of Motion to Exclude Report and Testimony of Plaintiffs' Expert ("Defendant's Exclusion Memo"), p. 12). SCM concludes that "Holt's opinions are irrelevant and inadmissible … because they provide no reliable basis for a jury to conclude Erazo would have used the riving

knife had it been stored on the saw itself rather than a few feet away in a toolbox and would not have been injured as a result." (*Id.*).

Defendant's Exclusion Memo also discusses – albeit only in a footnote – that portion of Holt's Report which notes that the Saw lacks anti-kickback pawls. Citing to page 4 of Holt's Report, SCM contends that Holt "does not opine the absence of anti-kickback pawls rendered the SCM Saw defectively designed or caused Erazo's injury." (*Id.*, p. 9, n. 4). Furthermore, SCM notes that pawls are not a design alternative to a riving knife but can only be used along with a riving knife. (*Id.*). Defendant contends that, since Holt testified that the use of a riving knife alone would have prevent Erazo's injury, the existence or non-existence of pawls is irrelevant.

Defendant's Exclusion Memo does not specifically address that portion of Holt's Report which opines that the Saw is defectively designed because the Guard is easily removable and because the Saw provides no blade hazard control once the Guard is removed.

### G. Plaintiffs' Response to the Motions

Plaintiffs oppose both motions in single document entitled Memorandum of Law by Plaintiffs in Opposition to the Motion by Defendant SCM … for Summary Judgment and to Exclude Plaintiff's [*sic*] Expert Witness ("Plaintiffs' Opposition"), dated August 10, 2018. (Doc. No. 38). That memorandum of law contains arguments which rely, in part, on two affidavits executed a few days before Plaintiffs' Memo was served: an eight-page Affidavit in Opposition sworn by Erazo on August 7, 2018 (the "Erazo Affidavit") (Doc. No. 39-1) and an 18-page affidavit sworn by Holt on August 9, 2018 (the "Holt Affidavit") (Doc. No. 39-7).

#### 1. The Erazo Affidavit

The Erazo Affidavit is largely consistent with his deposition testimony, except in two notable respects. First, Erazo states that he would have used the riving knife when making a rip

cut if there had been labels on the Saw warning him of kickbacks and instructing him to use the riving knife and Guard to protect against kickbacks and injury to his fingers. (Erazo Aff., ¶ 24). Erazo claims that labels with these instructions and warnings would have made a difference in how he used the Saw. (*Id.*).

Second, Erazo states that if the Saw had been equipped with a retractable riving knife like that on the Bosch 4100, he would have used it. (*Id.*, ¶ 28). Erazo admits 1) that he previously testified that "pushing the wood was harder with the blade guard and riving knife," (*id.*, ¶ 26), and 2) that he did not like using the Guard because it obscured his view of the workpiece, (*id.*, ¶¶ 14, 26). However, he claims that he "did not remove the riving knife based on a decision [he] made by [himself], but rather because Imperatore told him to do so." (*Id.*, ¶ 25). According to Erazo, Imperatore told him to remove the Guard and the riving knife because "they slowed production, and prevented making non-through cuts, such as when door openings were cut into a panel of plywood." (*Id.*, ¶ 25).

Although Erazo states that he has only seen diagrams and pictures of the Bosch riving knife, he "understand[s] that it operates by releasing a lever that holds the riving knife in place in the position you want while cutting." (*Id.*, ¶ 27). Based on this understanding, he asserts that it is "much easier and quicker to adjust … than using the wrench to remove and replace the riving knife on the … [S]aw." (*Id.*, ¶ 27). He reasons that because "adjusting the position of the riving knife would have been so much quicker and easier, … the riving knife would not have interfered with production." (*Id.*, ¶ 28). However, Erazo does not represent or provide any evidence that Imperatore would have agreed with his assessment.

Third, Erazo claims that he would have used pawls had the Saw been equipped with them. To be sure, Erazo does not use the word "pawls," much less represent that he has any

experience using them. Rather, he states that he "observed curved metal plates with teeth on the Bosch riving knife and blade guard" and "understand[s] that … [they] function to prevent a kickback from progressing, so that the wood does not fly off the table." (*Id.*, ¶ 29). Erazo represents that if the Saw had "metal plates with teeth to prevent kickbacks form [*sic*] progressing all the way to wood flying off the table," he would have used them "to control the wood during a kickback." (*Id.*).

## 2. The Holt Affidavit

The Holt Affidavit purports to "to clarify [his] deposition testimony and [his] report." (Holt Aff., ¶ 3). In fact, the affidavit is essentially a new report. First, it identifies entirely new defects: 1) "inadequate guarding of the rotating blade," 2) "inadequate warnings of the hazards that cause and contribute to blade contact by the user," and 3) inadequate "instructions contained in the … [M]annual," which "do not inform the user of the hazards associated with the table saw." (Id., ¶ 2). As Holt himself admitted during his deposition, his initial report contained no opinions about warnings or instructions. (*See* Holt Dep., p. 50). Second, although Holt's Affidavit does not list the lack of pawls as a design defect, the affidavit expounds upon the opinion, expressed in Holt's Report, that the Saw was defectively designed because it did not provide anti-kickback pawls. Among other things, the affidavit cites – for the first time – to the specific provisions of ANSI 01.1 on which this opinion relies. Third, the affidavit cites to and attaches peer reviewed articles and other scholarly works and documents which were not mentioned or attached to Holt's Report and which address deficiencies identified in Defendant's Exclusion Memo. For example, paragraph 24 of the Holt Affidavit cites to various documents to establish that the retractable riving knife feature has been available since the 1930s; paragraph 29 cites to a website to establish the cost of the Bosch 4100's riving knife and pawls; and

paragraphs 37–58 cite to various works that purportedly substantiate Holt's claim that operators would "more probably" use the riving knife if it were storable.

The Holt Affidavit also addresses, both explicitly and implicitly, opinions expressed by SCM's expert, Jack E. Hyde, Jr. Notably, Holt concedes the Saw's "riving knife safety feature is necessarily removable to allow cuts which cannot be made if the riving knife is in its operative position." (Holt Aff., ¶ 23). Holt further acknowledges that "it may be impractical to include a non-removable riving knife," not only because the knife may become damaged but also because "riving knife thicknesses will vary for use with different saw blade thicknesses." (*Id.*, ¶ 24). To accommodate the possibility that the knife may become damaged, Holt proposes that the riving knife be made "replaceable in the assembly which allows its adjusted position with a clamping mechanism." (*Id.*, ¶ 26). However, he tacitly admits that he has no solution for the "need to provide different size riving knives," stating that this problem "can be obviated by providing only one size blade (the larger 14 inch), which can duplicate any cuts made by the smaller (10 inch) blade." (*Id.*, ¶ 25).

## H. Defendant's Motion to Strike the Holt Affidavit

Along with its replies to the motion for summary judgment and the motion to exclude Holt's report and testimony (Doc. Nos. 40 & 41), SCM filed a motion to strike the Holt Affidavit (Doc. No. 42). In that motion, SCM argues that the deadline for filing a revised expert report was November 29, 2017, and that Holt should not be permitted to express new opinions and provide additional support for those opinions at this late date. Plaintiffs have not responded to this motion.

## II.  Discussion

### A.  The Legal Standard Relating to Diversity Cases

Defendant SCM removed this action to this Court on diversity grounds.  "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005) ("New York state procedural rules do not apply … to a federal court sitting in diversity").  "Classifying a rule as substantive or procedural is sometimes a subtle undertaking."  *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 150 (2d Cir. 1998).  "But where the matter in question is one covered by the Federal Rules of Civil Procedure, 'it is settled that … the Federal Rule applies regardless of contrary state law.'"  *Id.* at 150–51 (quoting *Gasperini*, 518 U.S. at 427, n.7).  "[T]he summary judgment standard is procedural, and there is a federal procedural rule on point – *i.e.*, Rule 56."  *All Am. Tel. Co., Inc. v. AT & T Corp.*, 328 F. Supp. 3d 342, 354 (S.D.N.Y. 2018).  Similarly, since "[m]ost evidentiary rules are procedural in nature, … the Federal Rules of Evidence ordinarily govern in diversity cases."  *Goodnough v. Clark*, No. 3:15-CV-0648 (GTS)(DEP), 2017 WL 4326060, at *8 (N.D.N.Y. Sept. 27, 2017) (internal citations and quotation omitted).

### B.  The Motion to Exclude the Holt's Report and Testimony

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

As used in this section, "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). The requirement "that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue' … goes primarily to relevance." *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 Weinstein & Berger ¶ 702[02], p. 702–18).

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "The admissibility of all expert testimony under Rule 702 is a preliminary question of law for the district court to determine pursuant to Federal Rule of Evidence 104(a), *see Daubert*, 509 U.S. at 592, … and district courts have broad discretion when determining whether or not to admit expert testimony." *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003) (citing *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993)). "The proponent of the evidence … must establish admissibility under Rule 104(a) by a preponderance of the evidence." *Id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)).

The objective of this "gatekeeping" requirement is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "[E]xpert testimony

should be excluded if it is speculative or conjectural, … or if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)).  However, "other contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" *Id.* (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.), *cert. denied*, 506 U.S. 826 (1992)).  "A district court has discretion under Federal Rule of Evidence 703 'to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.'" *Id.* (quoting *Shatkin*, 727 F.2d at 208).

"[T]he district court functions as the gatekeeper for expert testimony … whether proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotations and citation omitted).  As the Second Circuit noted in *Salvino*:

> An expert's opinions that are without factual basis and are based on speculation or conjecture are … inappropriate material for consideration on a motion for summary judgment.  … An expert's conclusory opinions are similarly inappropriate.

*Id.* at 311 (internal citations omitted).

In *Kumho Tire*, the Supreme Court held that the trial judge's gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 526 U.S. at 141.  While emphasizing that the test for reliability is "flexible," *id.*, the Supreme Court held that "a trial judge determining the 'admissibility of an engineering expert's testimony' may consider" the following factors:

(1) whether a theory or technique can be (and has been) tested;

(2) whether it has been subjected to peer review and publication;
(3) whether, in respect to a particular technique, there is a high
known or potential rate of error and whether there are "standards
controlling the technique's operation"; and
(4) whether the theory or technique enjoys general acceptance
within a relevant scientific community.

*Id.* at 149–50 (internal quotations omitted).  Although the Second Circuit has acknowledged that

this "list of factors 'neither necessarily nor exclusively applies to all experts or in every case,'" it

has also stated: "A district court should consider the *Daubert* factors 'where they are reasonable

measures of the reliability of expert testimony.'"  *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355,

358 (2d Cir. 2004) (quoting *Kumho Tire*, 526 U.S. at 141, 152).

In *Zaremba*, the Second Circuit considered the *Daubert* factors in evaluating the

admissibility of an expert's testimony regarding a safer alternative design.  The Court held:

Plaintiffs have satisfied none of the four factors identified in
*Daubert* with respect to [the expert's] testimony about a safer
alternative design: (1) [the expert] has not tested his design; (2) he
has not subjected it to peer review or publication; (3) his design
does not have a "known rate of error," since it has not been tested;
and (4) [the expert] has not shown general acceptance either of his
design or of his methodology.

*Id.*  In addition, the Second Circuit noted that "[n]umerous courts have excluded expert

testimony regarding a safer alternative design where the expert failed to create drawings or

models or administer tests," *id.* (citing cases), and that the Court itself had "upheld the exclusion

of an expert who, among other 'shortcomings,' 'never attempted to … test his theory' of a safer

[alternative] … design."  *Id.* at 359 (quoting *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92

(2d Cir. 2000)).

Although plaintiff's expert has been permitted to testify in dozens of cases over the last

four years, including some involving table saws, some of his testimony has been excluded in at

least three cases.  In *Santella v. Grizzly Indus., Inc.*, No. A-I 1-CV-181-LY, 2012 WL 12045118,

at *2 (W.D. Tex. Dec. 12, 2012), a district judge excluded as "merely speculative" Holt's opinion that a riving knife "would not have been removed, or would have otherwise been replaced if it had been taken off." *Id.* at *2. The judge noted that Holt "fail[ed] to provide any statistical evidence demonstrating the propensity of a person to remove a riving knife, or to replace it once it is removed." *Id.*

In *Maga v. Hennessy Indus., Inc.*, No. CIV. 12-11423-FDS, 2014 WL 10051399 (D. Mass. Dec. 1, 2014) – a case involving an allegedly defective automotive lift – Holt proposed an alternative design in which an "arm lock plate" would be "equipped with round holes instead of elongated holes." The district judge excluded testimony regarding this proposed alternative design, holding that it was "too speculative to survive scrutiny under Rule 702." *Id.* at *9. The judge stated:

> Holt did not subject his proposal to review under his own safety hierarchy; he created no model or simulation demonstrating how the alternative design would work; and he did not analyze how the change would affect the function or operation of the lift. Holt likewise did not provide any proof that the lift could have been manufactured in the manner he proposes in 2000, the relevant time period.
>
> It is a reasonable assumption that the lift was manufactured with elongated holes for some purpose. It may have been to make the machine function properly; it may have been to facilitate assembly; it may have been to permit adjustment; it may have been to facilitate maintenance or cleaning. It may have been more cost-efficient. It may have had some other purpose. But Holt gives no explanation as to whether or to what extent a design with round holes would have been able to accomplish the same purpose – whatever that purpose was – as of the time the lift was made. Indeed, Holt does not address the issue at all. An expert may not simply state that a design should have been different without analyzing and explaining why the new design would have been technologically feasible and practical. *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 428, 990 N.E.2d 997 (2013). Without a sufficiently detailed analysis of a proposed alternative design, the jury would be left with nothing more than "pure speculation" as to

its feasibility. *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 27 (1st Cir. 2004).

> Overall, Holt's opinion as to a proposed alternative design appears to be mere conjecture that has not been subject to the rigorous standards regularly used in the field in engineering and mechanical design. *See Kumho Tire* … , 526 U.S. [at] … 152 (stating that the objective of *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

*Maga*, 2014 WL 10051399 at *10.

In *Wood v. Robert Bosch Tool Corp.*, No. 4:13-CV-1888 (TCM), 2015 WL 5638040 (E.D. Mo. Sept. 24, 2015), the defendant challenged the relevance of Holt's opinion that a saw guard was defective because many users remove it. Noting that the plaintiff had the guard in place at the time of the accident, the court granted the defendant's *Daubert* motion "to the extent it challenges Holt's opinion that the guard is defective in that many table saw users remove it." *Id.* at *12.

In Defendant's Exclusion Memo, SCM principally argues that those portions of the report which opine that the Saw was defectively designed because the riving knife is removable and which propose a safer alternative design suffer the same deficiencies identified in *Santella* and *Maga*. In addition, SCM argues that Holt's opinion about whether an operator is more likely to use the alternative design is unsupported by any statistics and, in any event, is irrelevant because Erazo testified that he did not like using riving knives. The Court agrees with Defendant.

First, Holt himself has abandoned the view that the Saw is defective simply because the riving knife is removable. In his affidavit, executed after he had a chance to read the report of Defendant's expert, Holt states that the "subject riving knife feature is *necessarily* removable" because there are cuts which "cannot be made if the riving knife is in its operative position."

Holt Aff., ¶ 23 (emphasis added). In addition, Holt concedes that it would be "impractical to include a non-removable riving knife" since 1) the riving knife could be damaged and 2) "riving knife thicknesses will vary for use with different saw blade thicknesses." Holt Aff., ¶ 24. Accordingly, Holt himself acknowledges that the riving knife would have to be "replaceable." *Id.*, ¶ 26.

Second, as in *Maga*, Holt's proposed alternative design "appears to be mere conjecture that has not been subject to the rigorous standards regularly used in the field in engineering and mechanical design." *Maga*, 2014 WL 10051399, at *10. Holt's Report simply assumes that the retractable riving knife used on the Bosch 4100 could also be used on the larger, more sophisticated Saw. He has not provided the Court with drawings or models of the proposed design, much less tested the design or subjected it to peer review or publication. Moreover, since the proposed design has not been tested or published, his design does not have a "known rate of error" and Holt cannot show "general acceptance … of his design." *See Zaremba*, 360 F.3d at 358.

Moreover, in his affidavit, Holt tacitly admits that his proposed alternative design would reduce the Saw's utility. The Saw is designed to accommodate Blades of various dimensions. According to the Manual, the Saw can accommodate Blades with a diameter of between 250 and 350 millimeters and comes with two riving knives: one for use with a 250-millimeter diameter Blade and another for use with Blades ranging from 300 to 315 millimeters. Manual, pp. 1.16, 4.6. In addition, Holt acknowledges that "riving knife thicknesses will vary … with different saw blade thicknesses." Holt Aff., ¶ 24. However, if the Saw were designed with a non-removable riving knife, it would accommodate only one size Blade. Holt tacitly admits this, stating: "The need to provide

different size riving knives for different blade diameters can be obviated by providing only one size blade (the larger 14 inch), which can duplicate any cuts made by the smaller (10 inch) blade."  Holt Aff., ¶ 25.

This proposal is reminiscent of Holt's proposed alternative design in *Maga*, where Holt proposed round rather than elongated holes in the "arm lock plate."  Like the district judge in *Maga*, the Court can reasonably assume that the Saw was equipped with different sized Blades for a purpose.  *See Maga*, 2014 WL 10051399, at *10.  Holt offers no support whatsoever for his highly suspect claim that only one size Blade is necessary. Indeed, it is obvious that Blades of different widths would needed to cut grooves or dadoes of different widths.

Third, Holt's claim that an operator would "more probably" use a retractable riving knife appears speculative.  Holt testified that it took him "probably a couple of minutes" to install the riving knife on the Saw.  Holt Dep., p. 62.  Holt has not provided an estimate of how long it would take to raise and lower the retractable riving knife he proposes.  However, even assuming that it would take less than a "couple of minutes," the Holt Report offers no statistics or other proof to substantiate his claim that the time savings would be so substantial as to make an operator more likely to use it.

It is also unclear whether Holt has the sort of expertise that would permit him to offer an opinion as to operator behavior.  Holt may be an expert in mechanical engineering but has offered no evidence that he has "knowledge, skill, experience, training, or education" that provides a basis for predicting how a reduction in the time needed to install a riving knife would correlate with the likelihood of installing the riving knife.  Since Holt's opinion appears to rest solely on common sense, rather than his

"scientific, technical, or other specialized knowledge," his opinion that an operator would "more probably" use his proposed alterative design is inadmissible. *See* Fed. R. Evid. 702(a).

For these reasons, the Court excludes those portions of Holt's Report which opine that the Saw was defectively designed because the riving knife is removable, which propose an alternative design for the riving knife, and which opine that operators would "more probably" use the alternative design. However, the Court declines to exclude those portions of the report which opine that the Saw was defective because the Guard was removable and because it was not equipped with anti-kickback pawls.

First, defendant entirely ignores that portion of Holt's Report which identifies the removable Guard as a defect. Holt's Report states that both the "blade guard and riving knife are easily removable" and that the design provides "no blade hazard control" when these safety devices are removed. Holt's Report, p. 2. The report then discusses the "History of Table Saw Guards [and] Guard Standards" and "Good Safety Design Practices," before concluding that the Saw "did not comply with general safety requirement standards." *Id.*, p. 6. Read in a manner most favorable to plaintiffs, these sections identify the removable Guard as a defect. Yet, Defendant's MSJ Memo characterizes Holt's Report as opining only that the Saw is "defectively designed because its riving knife must be removed to enable the user to make certain types of cuts …." Defendant's MSJ Memo, p. 15. Defendant's Exclusion Memo does not mention the removable Guard at all.

Second, while Defendant's Exclusion Memo acknowledges that Holt's Report states that the Saw "is not equipped with anti-kickback pawls as required by ANSI 01.1

standard for woodworking equipment," Defendant's Exclusion Memo, p. 9, n. 4, it argues

that the report does not identify the lack of anti-kickback pawls as a design defect. Again

construing the evidence in the light most favorable to plaintiffs and drawing all

reasonable inferences in their favor, *see Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009),

the Court disagrees. Holt mentions Defendant's failure to equip the Saw with pawls in

the same paragraph in which he identifies the other two alleged design defects.

Specifically, he states:

> The rotating blade hazard on the [Saw] is inadequately
> safeguarded. The blade guard and riving knife are easily
> removable … and provide no blade hazard control when removed.
> Further, the saw is not equipped with anti-kickback pawls as
> required by ANSI 01.1 standard for woodworking equipment.

Holt's Report, p. 2. While this paragraph does not expressly state that the lack of pawls

is a design defect, it also does not expressly state that the removable riving knife is a

design defect. Yet, Defendant acknowledges that Holt's Report identifies that removable

riving knife as a design defect.

Defendant's Exclusion Memo also argues – albeit in a footnote – that Holt

conceded at his deposition that "anti-kickback pawls would have been difficult to include

on the … Saw and could not be used at all if the riving knife was not being used." *Id.*, p.

9, n. 4. This argument goes to the sufficiency of the evidence, rather than to its

admissibility. The Court will discuss plaintiffs' failure to adduce evidence of feasible

design alternatives in section II(D)(2)(a)(i), below.

### C. Defendant's Motion to Strike the Holt Affidavit

SCM moves to strike the Holt Affidavit as a sanction for failing to comply with

Rule 26(a)(2) of the Federal Rules of Civil Procedure. That rule provides that "a party

must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702 …." Fed. R. Civ. P. 26(a)(2)(A). "[T]his disclosure must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case," which contains, among other things, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them …." Fed. R. Civ. P. 26(a)(2)(B). "It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought." *Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05 Civ. 9546 (LMM)(THK), 2007 WL 4157163, at *4 (S.D.N.Y. Nov. 16, 2007).

Rule 26 also contains specific provisions governing when and under what circumstances an expert can or must amend or supplement his or her expert report. For example, Rule 26(a)(2)(D)(ii) requires that expert rebuttal evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party" must be disclosed "within 30 days after the other party's disclosure." Rule 26(e)(2) imposes a duty on an expert witness to supplement his or her report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). However, "Fed. R. Civ. P. 26(e) does not grant a license to supplement a previously filed expert report because a party wants to," *Sandata Techs*., 2007 WL 4157163, at *5 (quoting *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003), or "seeks to bolster its earlier submission." *Gyllenhammer v. Am. Nat'l Red Cross*, No. 3:15-CV-1143 (BKS)(DEP), 2018 WL 1956426, at *4 (N.D.N.Y. Jan. 23,

2018) (quoting *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12-CV-220 (WWE), 2014 WL 1572746, at *2 (D. Conn. Apr. 16, 2014)). "Put simply, experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions. If that were the case, there would never be any closure to expert discovery, and parties would need to depose the same expert multiple times." *Sandata Techs.*, 2007 WL 4157163, at *6.

The sanctions for violating Rule 26(a) or (e) are set forth in Rule 37(c)(1), which provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1). The orders listed in Rule 37(b)(2)(A)(i)–(vi) are as follows:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part; [or]
> (vi) rendering a default judgment against the disobedient party ….

Fed. R. Civ. P. 37(b)(2)(A).

Defendant's Motion to Strike the Holt Affidavit quotes only the first sentence of Rule 37(c)(1), which appears to "imply automatic preclusion of the evidence" absent a showing of substantial justification or harmlessness. *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000). Indeed, one district court has opined that "while trial courts have discretion to determine whether or not a substantial justification exists and whether or not a failure to disclose is harmless, if the trial court finds that there is no substantial justification and the failure to disclose is not harmless, preclusion is mandatory." *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 634, n. 3 (S.D.N.Y. 2005). The Second Circuit affirmed *Design Strategies* on appeal but expressly criticized this view, stating: "A district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37, and its ruling will be reversed only if it constitutes an abuse of discretion." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006).

"In determining whether the district court acted within its discretion, [the Second Circuit] considers '(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quoting *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)). While "bad faith and callous disregard of the Federal Rules" can be considered in determining the appropriate sanction, they are not prerequisites to excluding evidence under Rule 37. *See Design Strategy*, 469 F.3d at 296.

In assessing what sanction to impose, the Court will consider not only these factors but also the purposes of Rule 37 and Rule 37(c)(1) in particular. According to the Second Circuit,

the disciplinary sanctions in Rule 37 serve three purposes, including ensuring "that a party will not benefit from its own failure to comply." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). The purpose of Rule 37(c)(1) is similar: namely, "to prevent the practice of 'sandbagging' an adversary with new evidence." *Pearlman v. Cablevision Sys. Corp.*, No. 10-CV-4992(JS)(GRB), 2015 WL 8481879, at *10 (E.D.N.Y. Dec. 8, 2015) (quoting *Morganstern v. County of Nassau*, No. 04-CV-0058, 2008 WL 4449335, at *1 (E.D.N.Y. Sept. 29, 2008) (internal quotation marks and citations in *Morganstern* omitted)).

In this case, plaintiffs are not just "sandbagging" SCM with new evidence but with entirely new theories of liability. Plaintiffs' complaint did not specifically allege a failure-to-warn claim, aside from alleging a violation of defendants' "post-sale duties to warn." Compl., ¶ 20(e). The pleading contained no allegations whatsoever suggesting that the instructions accompanying the Saw were inadequate. Moreover, Holt's Report did not even mention the warnings and instructions accompanying the Saw. When asked by Defendant's counsel to confirm that his report contained "no opinion about warnings or instructions," Holt responded unequivocally: "It does not." Holt Dep., p. 50.

Months after the close of discovery and after being served with SCM's motion for summary judgment, plaintiffs decided to argue, for the first time, that the warnings and instructions were inadequate. Plaintiffs never sought to amend their pleading and have offered no explanation for Holt's failure to identify these alleged defects earlier. Indeed, plaintiffs have not even responded to Defendant's motion to strike the Holt Affidavit.

While Holt's Affidavit is the only evidence in this case relating to the inadequacy of warnings and instructions, the Court will not allow plaintiffs to introduce this evidence or to advance these entirely new theories at this late date. Defendant has already conducted discovery

and drafted its motion for summary judgment with the understanding that the adequacy of warnings and instructions were not at issue. To raise a failure-to-warn claim now, plaintiffs would have to amend their complaint and the parties would have to conduct discovery *ab initio*. This would not only prejudice Defendant but would require additional judicial resources. Accordingly, the Court will not permit plaintiffs to argue that the warnings and instructions accompanying the Saw were inadequate or to introduce evidence from Holt to that effect. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii).

In addition, the Holt Affidavit contains evidence and attachments which should have been included in Holt's Report. The Holt Affidavit identifies, for the first time, the specific provisions of ANSI 01.1 on which Holt grounds his claim that the Saw was defectively designed because it did not provide anti-kickback pawls. Holt Aff., ¶¶ 5–7. The Holt Affidavit provides the costs of the riving knife and pawls on the Bosch 4100, ostensibly as a way of estimating the costs of his proposed retractable riving knife design. Holt Aff., ¶ 29. The affidavit also cites to and attaches new authorities to support claims made in his prior report, including documents to establish that the retractable riving knife feature has been available since the 1930's and various works that purportedly substantiate Holt's claim that operators would "more probably" use the riving knife if it were storable. *Id.*, ¶¶ 37–58.

Holt does not explain why he was unable to cite or attach this evidence to his original report. None of the evidence is essential; it does not cure the deficiencies in plaintiffs' proof which are identified in subsection D below. Since plaintiffs first disclosed this evidence after Holt's deposition and after SCM had already served its motion for summary judgment, SCM never had the opportunity to question Holt about this evidence or to address it in their motion papers. Admitting this evidence without reopening discovery would prejudice SCM and benefit

plaintiffs. However, reopening discovery would also prejudice SCM and advantage plaintiffs by forcing SCM to incur additional costs, while giving plaintiffs another chance to prove their claims. Accordingly, the Court will also preclude the evidence and attachments identified in the preceding paragraph, all of which should have been included in Holt's Report.

The Court sees no need to strike the remaining portions of the Holt Affidavit. In particular, the Court will not strike those portions of the affidavit in which Holt acknowledges 1) that "the subject riving knife safety feature is necessarily removable," *id.*, ¶ 23; 2) that "riving knife thicknesses will vary for use with different saw blade thicknesses," *id.*, ¶ 24; 3) that the retractable riving knife may became damaged and must itself be "replaceable in the assembly which allows its adjusted position with a clamping mechanism, " *id.*, ¶ 26; and 4) that he has no solution for the "need to provide different size riving knives" other than restricting the user to a 14-inch diameter saw blade. *Id.*, ¶ 25.

### D. The Motion for Summary Judgment

#### 1. The Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a

lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."

*Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "In that event, the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment." *Id.*

"Not every factual dispute will preclude summary judgment." *Feder Kaszovitz LLP v.

Rosen*, No. 17-CV-2954 (CM), 2018 WL 3708662, at *4 (S.D.N.Y. Aug. 3, 2018). "Summary

judgment is warranted when, after construing the evidence in the light most favorable to the

nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as

to any material fact." *Sledge*, 564 F.3d at 108 (citing Fed. R. Civ. P. 56(c)). A disputed fact is

"material" if "it might affect the outcome of the suit." *Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005). In addition, "a genuine dispute requires 'evidence on which the jury

could reasonably find for the [non-movant].'" *Feder Kaszovitz*, 2018 WL 3708662, at *4

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If the non-movant fails

'to make a sufficient showing on an essential element of her case with respect to which she has

the burden of proof' at trial, then summary judgment will be granted." *Feder Kaszovitz*, 2018

WL 3708662, at *5 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## 2. State Substantive Law

In New York, "a manufacturer of a defective product is liable for injuries caused by the

defect." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 786 (2016). "Under New York's

modern approach to products liability, a product has a defect that renders the manufacturer liable

for the resulting injuries if it: (1) "contains a manufacturing flaw"; (2) "is defectively designed";

or (3) "is not accompanied by adequate warnings for the use of the product." *Id.* (citing cases).

Although plaintiffs' first cause of action accuses SCM of "negligently and carelessly …

manufacturing … dangerous and defective table saws," Compl., ¶ 20(a), plaintiffs have adduced no evidence of a manufacturing flaw. Accordingly, the Court need only address plaintiffs' allegations of a design defect and failure to warn.

Under New York law, there are four theories under which a plaintiff may pursue a recovery based upon a claim of products liability: (1) strict liability, (2) negligence, (3) express warranty, and (4) implied warranty. *Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 888 (E.D.N.Y. 2018) (citing *Hilaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223, 252 (E.D.N.Y. 2014); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106-07 (1983). None of plaintiffs' causes of action allege a breach of express warranties. Accordingly, the Court need only discuss strict liability, negligence, and breach of implied warranties.

### a. Strict Liability and Negligence

Although strict liability and negligence are distinct theories, courts often analyze strict liability and negligence claims together on the theory that they are "functionally equivalent." The New York Court of Appeals has expressly endorsed this view in the context of a failure-to-warn claim, stating: "While claims based on … a lack of adequate warnings … can be framed in terms of strict liability or negligence, failure-to-warn claims grounded in strict liability and negligence are functionally equivalent, as both forms of a failure-to-warn claim depend on the principles of reasonableness and public policy at the heart of any traditional negligence action." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 787, 59 N.E.3d 458 (2016).

Neither the New York Court of Appeals nor the Second Circuit has squarely endorsed the view that negligence and strict products liability claims for design defects are functionally the same. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 63 (2d Cir. 2002). To the contrary, the New York Court of Appeals has noted that "[s]trict products liability for design defect … differs from a

cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product." *Voss*, 59 N.Y.2d at 107. In strict products liability, the focus is on "whether the product, as designed, was not reasonably safe" – "that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* at 107, 108. "This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 256–57 (1995) (citing *Voss*, 59 N.Y.2d at 109).

Yet, the New York Court of Appeals has also stated that "[i]n general, … the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 (1995)). While the Second Circuit has noted that this statement was dicta, *Jarvis*, 283 F.3d at 63, district courts in this Circuit have cited it in support of the view that strict liability and negligence claims for design defects are also functionally equivalent. *See*, *e.g.*, *Oden*, 330 F. Supp. 3d at 887–88 ("Under New York law, a Plaintiff's claim based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently."); *Vicuna v. O.P. Schuman & Sons, Inc.*, 298 F. Supp. 3d 419, 449 (E.D.N.Y. 2017) ("Under New York law, 'the strict liability concept of defective design is,' in

general, 'functionally synonymous with the earlier negligence concept of unreasonable designing.'"); *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 739 (E.D.N.Y. 2016) ("Under New York law, a Plaintiff's claim based upon an alleged design defect, sounding in either negligence or strict liability, requires the same *prima facie* evidentiary showing."). Indeed, in a summary order, the Second Circuit itself has noted that "New York courts generally consider strict products liability and negligence claims to be functionally synonymous." *S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12 (2d Cir. 2014) (summary order) (quoting *Goldin v. Smith & Nephew, Inc.*, No. 12 Civ. 9217 (JPO), 2013 WL 1759575, at *6 (S.D.N.Y. Apr. 24, 2013)).

In this case, the Court need not hold that negligence and strict products liability claims for design defects are functionally equivalent or that all elements of the claims are the same. Defendant is principally arguing that plaintiffs' design-defect claims fail because plaintiffs have not established two elements: 1) that it was feasible to design the Saw in a safer manner and 2) that the allegedly defective design was a proximate cause of Erazo's injury. These are elements of design-defect claims under both strict product liability and negligence theories. First, the New York Court of Appeals expressly addressed the feasibility element in *Adamo v. Brown & Williamson Tobacco Corp.*, 11 N.Y.3d 545 (2008), stating:

> In *Voss v Black & Decker Mfg. Co.* [*supra*], speaking of a claim of strict product liability, we said: "The plaintiff … is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." While this is a negligence, not a strict liability, case, similar requirements apply – specifically, plaintiffs here had to prove that "it was feasible to design the product in a safer manner."

*Id.* at 550. Second, *Voss* makes clear that proximate causation is an element of both strict

products liability and negligence, although there is a subtle distinction between the showing

required in the two types of cases:

> Proximate cause in a products liability case serves a somewhat different
> role than in a case sounding in negligence because that cause of action
> seeks to impute liability to the manufacturer not on the basis of his
> negligence but because the product is not reasonably safe as it was
> designed. The tie which proximate cause is to provide in order to impose
> legal liability must be between the design defect of the product and the
> injury—that is, the plaintiff must show that the design defect in the
> product was a substantial factor in causing his injury.

*Id.*, 59 N.Y.2d at 110.

### i. Proof of feasibility

"The plaintiff bears the burden of presenting evidence that the product … feasibly could

have been designed more safely." *Fane v. Zimmer, Inc.*, 927 F.2d 124, 128 (2d Cir. 1991); *see*

*Greenberg v. Larox, Inc.*, 673 F. App'x 66, 69 (2d Cir. 2016) (summary order). To meet that

burden, "plaintiffs must show 'the potential for designing … the product so that it is safer but

remains functional.'" *Adamo*, 11 N.Y.3d at 550 (quoting *Voss*, 59 N.Y.2d at 109); *Church Ins.*

*Co. v. Comstock-Castle Stove Co.*, No. 515-CV-49 (BKS) (DEP), 2017 WL 1408042, at *5

(N.D.N.Y. Feb. 14, 2017). "'[I]n order to … raise a genuine issue of fact … [a plaintiff] must

present some admissible evidence that there exists a technologically feasible and commercially

practicable alternative design' that would have reduced or prevented the harm sustained by the

plaintiff." *Soliman v. Daimler AG*, No. CV 10-408 (SJF)(AKT), 2011 WL 6945707, at *5

(E.D.N.Y. Aug. 8, 2011), *report and recommendation adopted*, No. 10-CV-408 (SJF)(AKT),

2011 WL 4594313 (E.D.N.Y. Sept. 30, 2011) (quoting *Guarascio v. Drake Assocs. Inc.*, 582 F.

Supp. 2d 459, 463 (S.D.N.Y. 2008)). "Thus, a plaintiff must establish not only that a different

design would have led to improved safety, but also that adopting such a design would be

'economically and technically feasible.'" *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898 (RRM)(CLP), 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 15, 2009) (quoting *Ruthosky v. John Deere Co.*, 235 A.D.2d 620, 622 (N.Y. App. Div. 3d Dep't 1997)).

Under New York law, a plaintiff seeking to establish a design defect is generally required to provide expert testimony as to the feasibility and efficacy of alternative designs. *Id.* at *6 (citing cases). There are two means of proving the existence of a feasible alternative: the expert (1) "can show, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative; and/or (2) … can identify makers of similar equipment who have already put into use the alternative design that has been proposed." *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003). "New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving more complex design issues." *Guarascio*, 582 F. Supp. 2d at 463 (collecting cases). "[T]he absence of expert testimony is fatal to a case unless a reasonable alternative design is both obvious to, and understandable by, a layperson." *Id.*

In this case, plaintiffs have not adduced adequate evidence of a feasible alternative design. Read broadly, the Holt's Report identifies three defects: the "easily removable" riving knife, the "easily removable" Guard, and the complete absence of anti-kickback pawls. The Court has already excluded that portion of Holt's Report and testimony pertaining to his proposed alternative design for the riving knife, *see* section II(B), above, and Holt does not propose a safer alternative design for the Guard or the pawls.

With respect to the Guard, Holt's Report makes clear that "the common non-use of blade guards" is a well-documented problem in the table-saw industry. Holt's Report, p. 4. Holt states

that it has "long been known in the table saw industry that table saw guards are often removed by saw operators," and cites to 1924 and 2003 patent application which acknowledge this fact. *Id.* However, Holt's Report does not propose an alternative design or point to existing equipment incorporating an alternative design which would solve this intractable problem. While Holt alludes to a "modular guard" developed by the Power Tool Industry, *id.*, he himself does not represent that this guard is not removable. Rather, he asserts that the modular guard is "more user friendly" and that this "reduce[s] the frequency of removal or non-use." *Id.*

With respect to the pawls, Holt's Report states that, historically, United States table saws have been "equipped with a combination 3 in 1 guard comprised of a hood, splitter and anti-kickback pawls, *or* a suspended hood guard and separate riving knife such as that on the subject saw." *Id.* (emphasis added). This suggests that there are two separate categories of table saws: one using pawls and one addressing the kickback problem through other design elements. Holt offers no evidence that it is preferable, or even possible, to incorporate pawls into the design of table saws fitting into the latter category.

### ii. Proximate Causation

Separate and apart from their failure to establish safer alternative designs for the blade guard, riving knife, and pawls, plaintiffs have failed to establish that these alleged design defects were a proximate cause of Erazo's injury. First, Erazo's own affidavit suggests that the Guard was never actually removed, just swung away from the Blade. As discussed in section I(A), above, the Guard is attached to an "overarm" which pivots on a stanchion attached to the back of the Saw. According to Erazo, Imperatore told him to "remove the riving knife and to swing the blade guard to the side, away from the blade." Erazo Aff., ¶ 12. Similarly, at his deposition, Erazo recalled that his boss said, "just take it off and just run it back and to the left." Erazo Dep.,

p. 66. While there are places in the record in which Erazo states that Imperatore instructed him to "remove" the Guard, Erazo Aff., ¶ 14; Erazo Dep., p. 85, he also states that he "put the protector back over the blade" when inspectors arrived. Erazo Dep., p. 73. The fact that Erazo could replace the guard almost instantly when inspectors arrived, strongly suggests that the blade Guard was never removed, just repositioned.

Moreover, it is clear that Erazo would not have used the Guard even if had it not been removable. Before the Saw was delivered to Petrucelli in 2001, Erazo had been operating table saws for at least two decades. He had spent as many as ten years in his father's workshop in Colombia, where he operated two table saws. Erazo Dep., pp. 17, 23. He began working at Petrucelli in 1986, where he operated two other table saws. *Id.*, pp. 34, 37. There were no Guards on any of the four machines that Erazo had operated before the Saw. *Id.*, pp. 18–19, 38.

Being used to operating table saws without blade guards, Erazo felt "uncomfortable" using the Saw's Guard. *Id.*, pp. 75, 154. He not only found it "harder to push the wood" through the Blade, but also "didn't feel safer" using it. *Id.* Accordingly, Erazo would not have used the Guard even if it had been only adjustable, not removable.

Second, plaintiffs' claim that the removable riving knife was a proximate cause of the accident is entirely speculative. This claim is based on Holt's assertion that operators would "more probably" use his proposed retractable riving knife than the removable riving knife incorporated into SCM's design. The Court has already determined in section II(B), above, that this claim is not supported by any statistics or other evidence and, therefore, must be excluded as speculative. The Court has also already noted that since Holt has not built a prototype and cannot estimate the time-savings that would be

realized by switching from SCM's removable riving knife to his proposed retractable riving knife, there would be no basis for calculating the probability.

Furthermore, the evidence adduced by plaintiffs does not establish that Erazo would have "more probably" used the retractable riving knife at the time of the accident. To be sure, Erazo now states that he "would have used it because adjusting the position of the riving knife would have been so much quicker and easier." Erazo Aff., ¶ 28. However, Erazo signed this affidavit after he had learned, through this litigation, what causes a kickback and how riving knives function to prevent it. One can only speculate as to how Erazo, who testified that the delay in changing riving knives "bothered [him] a lot, Erazo Dep., p. 148 – would have balanced the costs and benefits of using a riving knife prior to developing this valuable insight.

Moreover, the basis for Erazo's assertion that adjusting the retractable riving knife would be "much easier and quicker" is unclear. There is nothing to suggest that Erazo – who professes to be "aware" of the Bosch design and to have seen "a copy of a diagram and pictures of the adjustable riving knife," *id.*, ¶ 27 – has actually attempted to adjust it. To the contrary, he states, "I understand that it operates by releasing a lever," and posits that changing the riving knife's position would be "much easier and quicker" because no tools are required. *Id.*, ¶ 27. Even assuming that Erazo could deduce that adjusting the riving knife on the Bosch 4100 would be easier and quicker than adjusting the riving knife on the larger, more sophisticated Saw – an apples to oranges comparison – Erazo could not know how long it would take to adjust the retractable riving knife that Holt proposes because Holt has not produced drawings or even a prototype.

In addition, Erazo testimony that he would use Holt's proposed retractable riving knife is itself based on speculation. Erazo himself readily admits that he "did not remove the riving knife based on a decision [he] made by [him]self." *Id.*, ¶ 25. Rather, he removed the safety device because Imperatore believed that the riving knife "slowed production" and told him to remove it. *Id.* Even if the proposed retractable riving knife were quicker to use, it would still take some time to adjust it and would slow production to some degree. There is no evidence that Imperatore would countenance any slowing of production whatsoever. *Id.*

Third, plaintiffs have adduced no evidence that the absence of pawls was a proximate cause of the accident. Since Holt has not produced a prototype for these pawls, any assertion that the action could have been prevented had these devices been used is entirely speculative.

Furthermore, even assuming that the pawls would be similar to those used on the Bosch 4100 (depicted on pages 35–37 of Doc. No. 39-1), there is no evidence that the pawls would have prevented the kickback that caused Erazo's injuries. Those pawls consist of two knife-like pieces of curved metal which hang down on either side of the Blade and have teeth on the edge facing the rear of the Blade. Shortly after the wood passes the rear of the Blade, it slides under the bottom-most teeth. Because of the way in which the teeth are constructed, they do not bite into the workpiece if it continues in the direction of the feed but would engage the workpiece if it were to reverse direction.

In this case, Erazo lifted the leading edge of the workpiece just before the kickback occurred. Assuming that the wood had even traveled far enough past the rear of the Blade to

engage the pawls, Erazo would have had to lift the pawls also in order to do so. This action would have defeated the purpose of the pawls.

### iii. Failure to Warn

As the Court noted in section II(C), above, plaintiffs' complaint does not expressly allege a failure-to-warn claim. The complaint does allege, however, that SCM was negligent in failing "to implement and perform post-sale duties to warn and retrofit the [Saw] … to prevent the injuries complained of herein." Compl., ¶ 20(e).

The New York Court of Appeal has "never imposed a post-sale duty to recall or retrofit a product." *Adams v. Genie Indus., Inc*., 14 N.Y.3d 535, 545 (2010); *Quiles v. Bradford-White Corp.*, No. 10-CV-747, 2012 WL 1355262, at *9 (N.D.N.Y. Apr. 18, 2012). However, it has recognized that manufacturers have "a legal obligation to issue warnings regarding hazards arising from foreseeable uses of the product about which the manufacturer learns after the sale of the product." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 788 (citing *Adams*, 14 N.Y.3d at 544); *Quiles*, 2012 WL 1355262, at *9. "Such a duty will generally arise where a defect or danger is revealed by user operation and brought to the attention of the manufacturer; the existence and scope of such a duty are generally fact-specific." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 240 (1998). The duty "extends to the original or ultimate purchasers of the product, to employees of those purchasers, and to third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 788–89 (quoting *McLaughlin v. Mine Safety Appliances Co.*, 11 N.Y.2d 62, 68 (1962)).

This post-sale duty to warn can arise in cases in which the manufacturer learns about modifications to or misuses of a product. For example, in *Liriano*, the plaintiff was injured when his hand became caught in a commercial meat grinder. At the time of the grinder's manufacture

and sale, the machine was equipped with a safety guard that would have prevented Liriano's injury. However, there were no warnings on the machine or otherwise to indicate that it was dangerous to operate the grinder without the safety guard, and the guard had been removed from the machine before Liriano's accident.

A federal jury awarded damages to Liriano. On appeal, the Second Circuit Court of Appeals certified the following two-part question to the New York Court of Appeals:

> Can manufacturer liability exist under a failure to warn theory in cases in which the substantial modification defense would preclude liability under a design defect theory, and if so, is such manufacturer liability barred as a matter of law on the facts of this case, viewed in the light most favorable to the plaintiff?

*Liriano*, 132 F.3d 124, 132 (2d Cir. 1998). After accepting the certified question, *Liriano v. Hobart Corp.*, 91 N.Y.2d 885 (1998), the New York Court of Appeals answered the first part of the question in the affirmative, holding that the manufacturer could be liable under a post-sale failure to warn theory. *Liriano*, 92 N.Y.2d at 236, 241. Although the Court of Appeals "decline[d] to answer the second part of the question in deference to the Second Circuit's review and application of existing principles of law to the facts," *id.*, at 236, it provided the following guidance:

> We should emphasize, however, that a safety device built into the integrated final product is often the most effective way to communicate that operation of the product without the device is hazardous. Thus, where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger. Thus, in appropriate cases, courts could as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury. Nevertheless, in cases where reasonable minds might disagree as to the extent of plaintiff's knowledge of the hazard, the question is one for the jury.

*Liriano*, 92 N.Y.2d at 241.  The Second Circuit subsequently applied these principles and decided, based on the facts of that case, viewed in the light most favorable to the plaintiff, that it could not "say, as a matter of law, that Hobart had no duty to warn Liriano …." *Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999).

In this case, there is no evidence that SCM first became aware sometime between the 2001 sale of the Saw and Erazo's 2013 injury that Saw operators were removing the Saw's safety guard or riving knife.  Indeed, according to Holt, "[i]t has long been known in the table saw industry that table saw guards are often removed by saw operators because they interfere with the view of their work."  Holt's Report, p. 4.  Accordingly, there is no evidence that defendant had a post-sale duty to warn of the dangers of removing the safety devices.

Even assuming defendant had such a duty, it would be appropriate, under the facts of this case, to hold as a matter of law that the "manufacturer's warning would have been superfluous" given Erazo's "actual knowledge of the specific hazard that caused the injury." *Liriano*, 92 N.Y.2d at 241.  Erazo is essentially the polar opposition of Liriano, who "was only seventeen years old at the time of his injury[,] … had only recently immigrated to the United States[,] … had been on the job … for only one week[,] had never been given instructions about how to use the meat grinder, and … had used the meat grinder only two or three times." *Liriano*, 170 F.3d at 269.  Erazo was 59 at the time the accident and was extraordinarily experienced in the use of table saws, having operated them since childhood.  Before he emigrated to the United States in 1986, he worked for as many as ten years in his father's carpentry shop, where operated two different table saws.  By his own account, he was already an "experienced carpenter" when he started working at Petrucelli.  Erazo Dep., 38.  Thereafter, he spent more than a quarter century

operating table saws for Petrucelli, including more than a decade operating the Saw. Throughout his tenure at Petrucelli, he spent eight hours a day operating a table saw. *Id.*, pp. 39, 54.

Given his extensive experience, Erazo was well aware that his hand would be seriously injured if it contacted the spinning Blade. *Id.*, pp. 18, 226. Indeed, he testified that he did not need any warnings or instructions with respect to this hazard. *Id.*, pp. 226-27. He also understood that the riving knife and Guard – both of which he called a "protector," *id.*, pp. 65, 146 – served to minimize that risk. Erazo may not have understood the cause of kickbacks or the riving knife's role in preventing them, but he knew that "[w]hen [the riving knife] was in place, it was protecting [him] from being cut." *Id.*, p. 107. In addition, he understood that the purpose of the Guard was cover the Blade and thereby protect the operator from coming in contact with it. *Id.*, p. 66. Moreover, regardless of what Imperatore may have told him, Erazo knew he was supposed to be using the Guard. Knowing that the inspectors required that the Guard be used at all times, Erazo placed it back over the Blade whenever the inspectors arrived. *Id.*, pp. 73, 83, 85.

Given Erazo's actual knowledge of the specific hazard that caused the injury, a manufacturer's warning about not removing the blade guard or riving knife would have been superfluous. To be sure, Erazo may have benefited from warnings or instructions on what caused a kickback and how a riving knife functioned to prevent it. However, given the fact that the Saw was designed for professionals working in commercial settings, a manufacturer could reasonably expect that an operator would know these basic woodworking facts.

Moreover, even assuming that SCM had a duty to warn about kickbacks and the riving knife's role in preventing kickbacks, breach of this duty could not have been a proximate cause of the accident. Erazo testified that he could not read English. *Id.*, p. 99. He could not read the

warnings that did exist, such as the label on the bottom of the blade guard which read: "Do not remove this guard. Guard must be in place all times when machine is in operation." *Id.*, pp. 77–78. If he could not read this relative simple instruction, he obviously could not read more technical literature, such as a description of what causes kickback and how a riving knife serves to prevent it. Moreover, that technical discussion would be too long to appear on a label and would have to appear in the Manual. Erazo, however, never saw the Manual. *Id.*, p. 79. Indeed, even though he was aware that the Manual existed and that Petrucelli had "stored it away," he never asked to see it. *Id.* Thus, the fact that certain warnings or instructions were not in the Manual could not have been a proximate cause of Erazo's accident.

### b. The Breach of Implied Warranties

The limitations period for causes of action for breach of implied warranty for the sale of goods is set forth in section 2-275 of the New York Uniform Commercial Code. *See*, *e.g.*, *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 411 (1985); *Lara*, 174 F. Supp. 3d at 745; *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 134 (E.D.N.Y. 2009). That section provides, in pertinent part:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.Y. U.C.C. Law § 2-725(1, 2). Under this section, a breach of warranty "cause of action against a manufacturer or distributor accrues on the date the party charged tenders delivery of the

product, not on the date that some third party sells it to plaintiff. *Heller*, 64 N.Y.2d at 411;

*Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 357, 364 (W.D.N.Y. 2013).

It is undisputed that SCM delivered the Saw to Alltech Machinery on April 18, 2001.

Def. 56.1 Stat., ¶ 10; Pl. 56.1 Stat., ¶ 10. Although Alltech sold the Saw to Petrucelli later that

year, Def. 56.1 Stat., ¶ 11; Pl. 56.1 Stat., ¶ 11, the limitations period began to run on April 18,

2001, and expired on April 18, 2005. *See Heller*, 64 N.Y.2d at 411. Plaintiffs did not commence

this action until January 28, 2016 – more than a decade after the statute of limitations expired.

Plaintiffs' Opposition, which does not even respond to SCM's statute of limitations argument,

does not contest this fact or suggest some basis for tolling the statute of limitations.

Accordingly, third and fourth causes of actions are dismissed as time-barred.

### c.  Loss of Consortium

"It is well established … that '[a] loss of consortium claim is not an independent cause

of action, but is derivative in nature,' and may only be maintained where permitted pursuant to

the primary tort." *Goldman v. MCL Companies of Chicago, Inc.*, 131 F. Supp. 2d 425, 427

(S.D.N.Y. 2000) (quoting *O'Gorman v. Holland*, No. 97 Civ. 0842 (WHP), 2000 WL 134514, at

*3 (S.D.N.Y. 2000). Moreover, a spouse's cause of action for loss of consortium does not exist

independent of the injured spouse's right to maintain an action for injuries sustained. *Liff v.

Schildkrout*, 49 N.Y.2d 622, 632 (1980). Thus, where a "husband's cause of action has been

terminated either by judgment, settlement or otherwise, that should operate to bar the wife's

cause of action for consortium." *Millington v. Se. Elevator Co.*, 22 N.Y.2d 498, 508 (1968).

This rule is regularly applied in the products liability context. *See*, *e.g.*, *Valente v.

Textron, Inc.*, 931 F. Supp. 2d 409, 440 (E.D.N.Y. 2013), *aff'd*, 559 F. App'x 11 (2d Cir. 2014);

*Delehanty*, 663 F. Supp. 2d at 130; *Macaluso v. Herman Miller, Inc.*, No. 01 Civ. 11496 (JGK),

2005 WL 563169 (S.D.N.Y. Mar. 10, 2005). *Delehanty* and *Macaluso*, like this case, involved husbands who were injured by an allegedly defective product. In both cases, the husband brought a products liability action, in which his wife also sued for loss of consortium. When the husband's causes of action were dismissed, the wife's derivate loss of consortium claims also failed. *Delehanty*, 663 F. Supp. 2d at 130 ("[U]nder New York law, Mrs. Delehanty's claim [for loss of consortium] must also be dismissed because Mr. Delehanty's causes of action fail."); *Macaluso*, 2005 WL 563169 at *9, n.3 (S.D.N.Y. Mar. 10, 2005) ("[Ms.] Malacuso's claim must be dismissed because, under New York law, it is completely derivative of the existence of a claim by Macaluso.")

Here, all of Erazo's claims have been dismissed. Since Montana's claim is "completely derivative" of Erazo's claims, it must also be dismissed. *See Delehanty*, 663 F. Supp. 2d at 130; *Macaluso*, 2005 WL 563169 at *9, n.3.

## CONCLUSION

For the reasons stated above, SCM's motions to exclude Holt's report and testimony and the motion to strike Holt's affidavit are granted in part and denied in part, SCM's motion for summary judgment is granted in its entirety, and this action is dismissed. The Clerk of Court is directed to enter judgment in favor of defendant SCM and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
March 1, 2019

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge